IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

2015 OCT 29 PM 4: 54

CLERK US DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____ Kev

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | |
| | § | |
| V. | § | CAUSE NO. A-14-CR-388-LY |
| | § | |
| CHARLES KLEINERT | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER GRANTING MOTION TO DISMISS**

On August 14, 1889, in the town of Lathrop, California, David Neagle shot and killed David

Terry.  Neagle was employed as a special deputy United States marshal for the Northern District of

California and given special instructions to protect Stephen J. Field, an associate justice of the

Supreme Court of the United States and the circuit justice for the Ninth Circuit, in which California

is located.  Field was in California, tending to his duties as circuit justice, and was traveling by train

from Los Angeles to San Francisco.  Neagle was accompanying Field because of threats made by

Terry and his wife against Field over an opinion Field had delivered a year earlier.  Neagle was

specially deputized, because the marshal was short handed and trouble was expected.  When the train

stopped in Lathrop, Field and Neagle alighted and proceeded to a dining room for breakfast.  Terry

entered the same location, approached Field, and struck him twice in the face.  Neagle shouted at him

to stop and identified himself as an officer.  Terry thrust his hand into his coat, at which time Neagle

fired two shots, killing Terry.  Upon a charge of murder, Neagle was arrested and held by the sheriff

of San Joaquin County, California.  In defense, Neagle asserted that he acted in discharge of his duty

as an officer of the United States and therefore could not be guilty of murder.  The Supreme Court

of the United States agreed.  *In re Neagle*, 135 U.S. 1 (1890).  This defense to state prosecution for

acts committed by federal officers in pursuance of federal duties is now generally referred to as Supremacy Clause immunity and is presented to this court today.

Defendant Charles Kleinert stands indicted by a state grand jury empaneled by the 167th Judicial District Court of Travis County Texas. The indictment charges that Kleinert

> recklessly cause[d] the death of Larry Jackson by [: **(1)**] striking and by attempting to strike Larry Jackson with the defendant's hand while holding a loaded firearm in that hand; [**(2)**] by seizing and by attempting to physically control Larry Jackson while holding a loaded firearm; and [**(3)**] by attempting to seize and physically control Larry Jackson without maintaining a distance between himself and Larry Jackson that was sufficient to enable the defendant to holster his firearm; thereby creating a substantial and unjustifiable risk that the firearm would discharge into Larry Jackson's body, thereby discharging the firearm into Larry Jackson's body, thereby causing the death of Larry Jackson.[1]

Kleinert removed the proceeding to this court, asserting that the court has federal-officer removal jurisdiction. *See* 28 U.S.C. §§ 1442(a)(1), 1455. He now moves the court to dismiss the state indictment against him. *See* Fed. R. Crim. P. 12(b)(1). Kleinert argues that, although he was employed as a police detective by the City of Austin, Texas, he was a specially deputized agent of the Federal Bureau of Investigation, a specially deputized United States deputy marshal, and a member of a federal task force and was pursuing his duties as a federal officer when he shot Jackson. He claims, like Neagle 126 years ago, Supremacy Clause immunity from prosecution. *See e.g., New York v. Tanella*, 374 F.3d 141, 151-52 (2d Cir. 2004); *Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir. 1988). The State of Texas disagrees, joining issue.[2]

---

[1] *See* Tex. Pen. Code Ann. § 19.04 (West 2011).

[2] Before the court are Kleinert's Motion to Dismiss Indictment filed June 26, 2015 (Clerk's Document No. 49), the State's Opposition to Motion to Dismiss Indictment filed July 10, 2015 (Clerk's Document No. 50), and Kleinert's Reply in Support of Motion to Dismiss Indictment filed

**Supremacy Clause immunity**

The Supremacy Clause of the United States Constitution provides, "This Constitution, and the Laws of the United States . . . shall be the supreme Law of the Land . . . , any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. The Supremacy Clause ensures that states do not "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819).

The Supremacy Clause has been held to protect federal officers from state prosecution under certain circumstances.

> [I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as [a federal officer] of the United States, and if in doing that act he did no more that what was necessary and proper for him to do, he cannot be guilty of a crime under the law[s] of the [state]. When these things are shown, it is established that he is innocent of any crime against the laws of the state, or of any other authority whatever. There is no occasion for any further trial in the state court, or in any court.

*Neagle*, 135 U.S. at 75.[3]

*McCulloch* and *Neagle* demonstrate the breadth of the immunity from prosecution the constitution provides federal officers in the carrying out of their duties. The language of both the constitution and the Supreme Court mandates this court to construe the Supremacy Clause broadly.

---

July 24, 2015 (Clerk's Document No. 51).

[3] *Neagle* was before the Supreme Court on an appeal from the circuit court's granting *habeas corpus* relief. The Supremacy Clause immunity principles enunciated in the *habeas* context apply equally to a Rule 12 motion to dismiss an indictment in a case removed under Title 28 United States Code section 1442. *See Long*, 837 F.2d at 751-52 (finding purpose of *habeas corpus* provisions "much the same as the purpose underlying the removal provisions" and applying *Neagle* principles to Rule 12 motion to dismiss based on Supremacy Clause immunity).

But federal courts have "an exceedingly delicate jurisdiction" that should be exercised only when the facts of the case are of an "exceptional nature." *United States ex rel. Drury v. Lewis*, 200 U.S. 1, 7 (1906) (internal quotations and citation omitted).

A state court is without jurisdiction to prosecute a federal officer if: (1) the federal officer was performing an act that he was authorized to do by federal law; and (2) in performing the authorized act, the federal officer did no more than what was necessary and proper. *Long*, 837 F.2d at 744. In determining whether the federal officer did no more than "what was necessary and proper," courts consider two separate elements: (1) whether the federal officer subjectively believed that his actions were authorized; and (2) whether this belief was objectively reasonable. *Id.* at 745 (citing *In re McShane's Petition*, 235 F.Supp. 262, 274 (N.D. Miss. 1964)).

The federal officer must be acting within the scope of his authority conferred by the laws of the United States. The ultimate issue of whether the officer's actions were necessary and proper turns on whether the federal officer employed means that he could consider reasonable in discharging his duty. *See Clifton v. Cox*, 549 F.2d 722 (9th Cir. 1977). The officer must have an honest belief that his actions were justified, and that belief must be reasonable. *Id.*

A federal officer is not required to show that his actions were in fact necessary or in retrospect justifiable. He only must show that he reasonably thought his actions to be necessary and justifiable. *Long*, 837 F.2d at 745-46 (citing *Connecticut v. Marra*, 528 F.Supp. 381, 387 (D. Conn. 1981) (applying *Neagle* standard to private citizen working as FBI informant)).

Upon establishing a Supremacy Clause immunity defense, it is not left to a federal or state jury to acquit the defendant of state-law criminal charges, nor to a federal or state judge to direct a verdict

in the defendant's favor; the federal or state court instead lacks any jurisdiction over the defendant. *Ohio v. Thomas*, 173 U.S. 276, 283 (1899).

**Procedure and burden of proof**

Traditionally, when considering a motion to dismiss an indictment, all evidence is viewed in the light most favorable to the state and the court assumes the truth of the allegations in the indictment. *See Tanella*, 374 F.3d at 148. Once the threshold defense of Supremacy Clause immunity is raised as to a state criminal prosecution, the state bears the burden of coming forward with an evidentiary showing sufficient to raise a material issue of fact concerning the validity of the Supremacy Clause immunity–whether the federal officer was performing an act that federal law authorized and whether the federal officer's actions were necessary and proper for him to do in the performance of his duties. *Long*, 837 F.2d at 752.

A motion to dismiss based on Supremacy Clause immunity should be granted only if the underlying facts supporting the defense are not in dispute. *See Tanella*, 374 F.3d at 148; *Idaho v. Horiuchi*, 253 F.3d 359, 367, *vacated as moot*, 266 F.3d 979 (9th Cir. 1988); *see also, Colorado v. Nord*, 377 F.Supp.2d 945, 948 (D. Colo. 2005); *City of Jackson v. Jackson*, 235 F.Supp.2d 532, 534 (S.D. Miss. 2002). But the state cannot overcome the defense nor meet its burden "merely by way of allegations." *Long*, 837 F.2d at 752; *see also Jackson*, 235 F.Supp.2d at 534 (when Supremacy Clause immunity is raised by motion to dismiss, district court should grant motion absent state's showing that facts supporting immunity claim are in dispute).

For the purpose of determining the motion to dismiss the indictment, the court assumes that Kleinert recklessly caused the death of Jackson by attempting to strike Jackson with a loaded firearm in the striking hand, by seizing and attempting to physically control Jackson while Kleinert was

holding a loaded firearm, and by seizing and attempting to physically control Jackson without maintaining a distance between himself and Jackson sufficient to enable Kleinert to reholster his firearm, and these actions by Kleinert created a substantial and unjustifiable risk that Kleinert's firearm would discharge, as it did, into Jackson's body and cause the death of Jackson. Because these facts provide "no assistance in determining the validity of the [immunity] defense," *New York v. Tanella*, 281 F.Supp. 2d 606, 611 (E.D. N.Y. 2003) (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)), *aff'd*, 374 F.3d 141 (2d Cir. 2004), and are not in material dispute, the court may determine the issue of Supremacy Clause immunity pretrial. *See* Fed. R. Crim. P. 12(b)(2).

Although there is no requirement that the court hold an evidentiary hearing on Supremacy Clause immunity, the court may do so. *See, e.g., Tanella*, 374 F.3d at 146 (affirming dismissal where state prosecutors argued "that a jury should decide the issue of immunity in the course of determining [the federal agent's] guilt[,] . . . declined the court's offer to hold an evidentiary hearing[,]" and relied instead on grand-jury testimony); *Long*, 837 F.2d at 728, 731 (affirming dismissal after district court held evidentiary hearing); *Arizona v. Files*, 36 F.Supp. 3d 873, 875, 884 (D. Ariz. 2014) (denying motion to dismiss after evidentiary hearing).

Here, as the only living witness to Jackson's death is Kleinert, the court concluded to hold an evidentiary hearing in order to carefully observe Kleinert's demeanor and evaluate his credibility, and to allow the parties a full and complete opportunity to present all matters they consider relevant to Kleinert's assertion of Supremacy Clause immunity. The parties signed and filed a "Limited Waiver of Jury Trial," agreeing that the court "resolve any and all factual issues related to [Kleinert]'s asserted defense of immunity from state prosecution under the Supremacy Clause," and waiving "the right to have any and all such factual issues be decided by a jury." The court accepted the waiver.

**Facts**

Although the facts pertaining to this case are not in dispute in any significant respect, the parties dispute which facts are relevant to the court's determination of the motion to dismiss. Kleinert asserts that testimony regarding Austin Police Department polices and his alleged violation of them is irrelevant to his defense of Supremacy Clause immunity, as is testimony that he made a series of objectively unreasonable decisions. The State of Texas counters that such testimony is relevant, as Kleinert was acting as a City of Austin Police Department detective at the time of Jackson's death, and has relevance to the subjective prong of this court's immunity analysis–whether Kleinert had an honest belief that his action was justified. The court allowed the parties to present all evidence they deemed relevant, stating that the court would consider only what the court ultimately found relevant, but allowing the evidence in order to provide a complete record.[4]

The court conducted two evidentiary hearings. The first on April 9, 2015, to determine whether to remand this matter to state court, and the second from September 30 to October 2, 2015, on the motion to dismiss. In April, the court determined that Kleinert satisfied the requirements of federal-officer jurisdiction and declined to remand this case, but allowed the State to present additional testimony and argument on that issue at the second hearing. Thus, the court now considers, to the extent relevant, all evidence presented at the two hearings, but will set forth here the evidence presented in it entirety.

---

[4] The court thus sustains in part and overrules in part, to the extent set forth in this memorandum opinion, Defendant Charles Kleinert's Objections to the State's Proposed Expert Witness Testimony (Clerk's Document No. 52).

On July 26, 2013, Kleinert, an Austin Police Department detective, was serving on a full-time assignment to the Federal Bureau of Investigation's Central Texas Violent Crime Task Force.[5] Kleinert, having been deputized by both the Federal Bureau of Investigation and the United States Marshals Service, was a "Special Federal Officer/Special Deputy-US Marshal." Kleinert maintained an office at the FBI's Austin headquarters, was issued FBI equipment, and had access to all nationwide FBI computer files. As a member of the task force and as a special federal officer, Kleinert was authorized to:

> (1) carry firearms; (2) execute and serve search warrants, arrest warrants administrative inspection warrants, subpenas, and

---

[5] The Austin Police Department and the Federal Bureau of Investigation executed a Memorandum of Understanding that has as its purpose:

> to delineate the responsibilities of the [task force] participants, maximize inter-agency cooperation, and formalize relationships between the participating agencies for policy guidance, planning, training, public and media relations. This [memorandum] is not intended, and should not be construed, to create any right or benefit, substantive or procedural, enforceable at law or otherwise by any third party against the parties, the United States, or the officers, employees, agents, or other associated personnel thereof.

Additionally, the memorandum recites that the mission of the task force is:

> to identify and target for prosecution organized crime groups and/or individuals responsible for Violent Incident Crimes, to include; Aggravated Robbery, both personal and commercial; Carjackings; Kidnappings; and Extortions. Through an aggressive utilization of the Unlawful flight To Avoid Prosecution [] Statutes, [the task force] will enhance the effectiveness of interstate, multi-jurisdictional fugitive investigations of major violent offenders. The [task force] will enhance the effectiveness of Federal/State/Local law enforcement resources through a well coordinated initiative seeking the most effective investigative/prosecutive avenues by which to convict and incarcerate dangerous offenders.

summonses issued under the authority of the United States; (3) make arrests without warrant (A) for any offense against the United States committed in your presence, or (B) for any felony, cognizable under the laws of the United States, if you have probable cause to believe that the person arrested has committed or is committing a felony; (4) make seizures of property pursuant to the provisions of this subchapter; and (5) perform such other law enforcement duties as the Attorney General may designate.

Kleinert's duties included, but were not limited to, investigating bank robberies.

On the morning of July 26, Benchmark Bank located on 35th Street in Austin, Texas, was robbed at gunpoint. The task force began investigating the robbery soon after it was reported. That afternoon, as part of the task force's ongoing investigation, Kleinert, in plain clothes, went to the bank to retrieve a copy of the bank's morning surveillance video. Due to the morning robbery, the bank was closed. A sign was taped to the bank's front door, informing customers that the bank was temporarily closed and would reopen as soon as possible. The bank did not reopen that day.

The bank's manager Kimberly Menge and her supervisor Sheila Bostik met Kleinert at the bank. The three knew each other, as Kleinert had conducted robbery-training sessions attended by Menge and Bostick. The three went to Menge's office and discussed the morning's robbery, while Menge downloaded the surveillance video for Kleinert.

During their discussion, through the window of Menge's office, which was immediately to the right of the bank's front door, they observed a man come to the front door and attempt to enter the bank.[6] Neither Menge nor Bostick knew the man, who later was determined to be Jackson.

---

[6] Evidence at the hearings, includes a composite video without audio that contains time-stamped and sequenced video excerpts from surveillance cameras at the bank, a nearby Randall's grocery store, and the nearby Seton Shoal Creek Hospital. The time stamps are somewhat different among the videos taken from the different cameras, but not materially so. The composite video is credible evidence of the duration of the events portrayed.

Jackson remained at the door only a short time and left the bank, but returned almost immediately, talking on a cell phone. Jackson pulled several times on the locked front door. Bostick went to the front door and inquired as to Jackson's business at the bank. As the door was nearby Menge's office, she was able to hear much of Bostick's conversation with Jackson. Jackson told Bostick that he was a bank customer and identified himself as "William Majors." Bostick asked Jackson to wait outside, which he did. Bostick returned to Menge's office and immediately told Kleinert that she knew the true William Majors, who was a personal friend of the bank's president, and Jackson was not Majors. Bostick asked Kleinert to speak with Jackson.

Kleinert went outside and directed Jackson to sit on the edge of a concrete planter just outside of Menge's office window. A very short time after Kleinert began speaking with Jackson, Jackson suddenly stood up and quickly ran away from Kleinert. Kleinert ran after Jackson.

As she had observed all of Jackson's and Kleinert's interactions through her office window, Menge immediately called 9-1-1, reporting that Kleinert was running after Jackson. Surveillance video from Seton Shoal Creek Hospital, located near the bank, shows Jackson running and Kleinert running after Jackson.

Shortly before, Regina Bethune, an ordained minister, board-certified chaplain, and the Seton Health Care Family Network Director for Chaplain Services and Director for Clinical Pastoral Education, left her office at Shoal Creek Hospital. As she drove her car out of the hospital's parking lot and approached Mills Avenue, the street immediately out of the parking lot, she saw Kleinert running in the middle of the street. As she stopped her car, Kleinert ran to the vehicle and banged on her passenger-side window, yelling, "Austin Police–Stop!" Kleinert showed Bethune his Austin Police identification badge clipped to his shirt collar. Bethune did not know Kleinert. Bethune

10

described Kleinert as agitated, red in the face, and breathless.  As he got into her car, Kleinert told Bethune twice, in a commanding voice, to "Go, go–follow him."  The person to whom Kleinert referred was a man Bethune saw walking at a normal pace in a grassy, tree-lined area near the intersection of 34th Street and Mills Avenue.  Kleinert indicated to Bethune either orally by saying "there he is," or by pointing to the left toward 34th Street.  Bethune asked Kleinert if the man was dangerous, and Kleinert responded, "No."  Bethune turned left onto 34th Street, and soon after, Kleinert said, "Slow, slow" then "Stop," which she did near a bridge on 34th Street that passed over Shoal Creek.  Once stopped, Kleinert got out of the car and Bethune drove away.  Bethune said that Kleinert was in her car for only a brief time, maybe one or two minutes.

Kleinert testified that he entered Bethune's car so that he could continue to see Jackson and actively pursue him, because, due to Jackson's running, the gap was widening between the two.  Kleinert had with him his FBI issued mobile phone, handcuffs, and his holstered firearm.  Kleinert believed that the use of Bethune's car could more easily close the gap between him and Jackson.[7]

After Kleinert exited Bethune's car near the bridge, he walked down a slope toward the hike-and-bike trail that runs under the bridge and along Shoal Creek.  Kleinert saw Jackson walking out from under the bridge and away from where Kleinert was standing.  Kleinert observed that Jackson had removed the shortsleeved front-button blue shirt he had been wearing at the bank and was

---

[7] Kleinert and Bethune also testified before the Travis County grand jury.  Included as an exhibit to the State's opposition to the motion to dismiss is a copy of Kleinert's grand-jury testimony.  Kleinert, in support of his motion to dismiss, submitted an affidavit.  At the hearing on the motion to dismiss, the parties argued that portions of Kleinert and Bethune's grand-jury testimony should be considered by the court.  As Kleinert and Bethune testified in person and were subject to cross examination, the court has not considered either party's grand-jury testimony or Kleinert's affidavit for any purpose other than possible impeachment of their live testimony.  However, any differences in the testimony of either before the grand jury and in this court are insignificant.

carrying it; Jackson was now wearing a white t-shirt.  As Kleinert observed Jackson walking on the trail, he was unable to determine whether Jackson had a weapon.  Kleinert continued to approach Jackson and when Kleinert was about 50 feet from Jackson, Kleinert drew his firearm and yelled at Jackson, "Get down on the ground!"  Jackson stopped, but did not get down on the ground.

Kleinert, with his firearm still drawn, moved toward Jackson.  Jackson suddenly turned, threw down his blue shirt, and ran away from Kleinert back toward the bridge.  Kleinert intersected Jackson's route and grabbed Jackson by the t-shirt.  Jackson did not stop, and the two proceeded under the bridge together with Kleinert's left hand holding Jackson by his t-shirt in the neck and shoulder area and Kleinert's right hand holding his firearm.  Jackson did not stop, but continued running with Kleinert holding on to him.  Jackson turned to his left just under the bridge, attempting to run up an uneven and somewhat rocky embankment or slope, away from the trail.  As Jackson was attempting to run up the embankment and as he was somewhat hunched over, Kleinert hit Jackson twice on the right side of Jackson's lower back.  Kleinert's two hits to Jackson were with the bottom of Kleinert's right fist while Kleinert was holding his firearm with his right index finger along the slide.  As Kleinert was about to hit Jackson a third time, Jackson turned all the way around, facing back toward the trail, and in doing so, turned directly into Kleinert's body, and Kleinert fell.  During Kleinert's fall, he heard a gunshot, looked around, and saw Jackson lying on the ground.  Kleinert checked Jackson and instantly knew what had happened.

Kleinert immediately phoned police dispatch and reported the shooting.  The parties stipulate that an Austin emergency dispatch call was received at 4:10:52 p.m. from Kleinert.  The parties stipulate that the firearm issued to Kleinert fired the bullet that killed Jackson and that Jackson died as a result of a single gunshot wound to the back of the neck.

The elapsed time from Kleinert engaging Jackson in conversation at the bank to Jackson's death under the bridge was approximately four minutes.

Kleinert testified that he did not intend to kill Jackson nor did he intend for his weapon to discharge.  Further, Kleinert testified that he pursued Jackson because he was concerned about Majors, particularly because although Jackson told Kleinert during questioning at the bank he was Majors's brother, Jackson had not provided Kleinert with any verification of that fact, and instead had run away from Kleinert.  Kleinert stated he believed that his actions in pursuing Jackson to further investigate Jackson's actions and representations at the bank and Kleinert's attempt to arrest Jackson were all within the scope of Kleinert's federal authority and training, and that his actions in pursuing Jackson were no more than what was necessary and proper given the rapidly evolving situation.

David Dolinak, former Travis County Chief Medical Examiner, testified that he went to the scene on July 26, 2013, and later performed the autopsy on Jackson.  There was no blunt force trauma to Jackson's head, back, or shoulders and there was no bruising on Jackson's back.  Jackson had abrasions on his face, which Dolinak believed consistent with falling to the pea gravel pavement. Jackson had other injuries that Dolinak believed were probably caused from a car wreck Jackson had earlier that day, and that these other injuries were not caused by Kleinert.

**Analysis**

### Kleinert's status as a federal officer

The State maintains Kleinert is not entitled to Supremacy Clause immunity because Kleinert was not a federal officer nor were his actions authorized by federal law.  The State argues that Kleinert is not entitled to immunity because his interactions with Jackson were not within his federal-task-force duties nor authorized by the laws of the United States.  Rather, the State argues that

13

Kleinert had no federal duty to investigate Jackson's actions or to detain or arrest Jackson, but was acting solely pursuant to his duties as an Austin police officer.

The State contends that Kleinert's federal duties were circumscribed solely by the terms of the Memorandum of Understanding and that Kleinert's FBI and U.S. Marshals deputations are inapplicable. Specifically, the State argues that based on the memorandum's stated purpose and mission, Kleinert was not a federal officer from the time he first approached Jackson outside the bank. As the incident developed, and Jackson ran from Kleinert's questioning, the State argues that at most Kleinert had authority as a Texas police officer to arrest Jackson for evading arrest, which is a misdemeanor offense under Texas law.

The court disagrees. The court concludes that by virtue of Kleinert's deputations, he was authorized to investigate federal crimes committed in his presence. The deputations alone establish Kleinert as a federal officer. Based on Jackson's statements to Bostick, which she relayed to Kleinert, and Kleinert's own abbreviated conversation with Jackson, Kleinert had ample cause to believe Jackson was attempting to wrongfully obtain funds from the bank. Jackson's fleeing the conversation with Kleinert further indicated that Jackson's purpose at the bank was different from the way he described it to Bostick and Kleinert. The court concludes that from the time Kleinert began his conversation with Jackson until the time Jackson died, Kleinert was acting in his capacity as a federal officer and, as such, is entitled to the defense of Supremacy Clause immunity. In reaching this conclusion, the court has not considered any of the testimony or evidence regarding City of Austin police procedures, either lay or expert. Those procedures are simply not relevant to the immunity defense asserted by Kleinert.

14

However, the court's conclusions would be the same had the court determined that the success of Kleinert's motion to dismiss is dependent on his task-force duties.   Courts have consistently treated local law-enforcement agents deputized as federal agents and acting as part of a federal task force as federal agents. *See United States v. Martin*, 163 F. 3d 1212, 1214 (10th Cir. 1998) (local police detective deputized to participate in federal narcotics investigation is a federal officer within the meaning of Title 18 United States Code section 115(a)(1)(B)); *United States v. Torres*, 862 F.2d 1025, 1030 (3d Cir. 1988) (same); *Amoakohene v. Bobko*, 792 F.Supp. 605, 607 (N.D. Ill. 1992) (arrestee prohibited from bringing Section 1983 suit against DEA task-force members, including deputized local law enforcement officers, because task-force members were acting as federal agents, not state actors, even though they arrested him on municipal charges).

Based on the testimony and evidence presented at the removal-jurisdiction hearing, the court determined for removal purposes that Kleinert was a federal officer or was a person acting under a federal officer.   The court has now heard additional evidence and again finds and concludes that Kleinert was a federal officer for purposes of Supremacy Clause immunity during all of the events the afternoon of July 26, 2013.

On July 26, 2013, Kleinert was on a full-time assignment to the task force.   FBI Special Agent Dennis May acted as the task force's advisor.   Kleinert may be said to have worked under May and Phillip Gadd, who was the Supervisory Special Agent in charge for the task force.   Kleinert maintained his office at the Austin FBI headquarters and had been issued FBI equipment.   Pursuant to his FBI special deputation, Kleinert was authorized to make arrests for any offense against the United States committed in his presence or for any felony, cognizable under the laws of the United States, if he had probable cause to believe that the person to be arrested has committed or is

15

committing a felony. On the face of the deputations, Kleinert had the authority to make warrantless arrests for all crimes against the United States committed in his presence. Kleinert had nationwide law-enforcement jurisdiction. The federal offense of bank robbery is committed when one, "enters or attempts to enter any bank, . . . with intent to commit in such bank, . . . any felony affecting such bank, . . . and in violation of any statute of the United States, or any larceny." 18 U.S.C. § 2113(a); *see also* 18 U.S.C. § 1344 (federal bank fraud committed when person "attempts to execute, a scheme or artifice . . . to obtain any of the moneys . . . under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises").[8] Further, Supremacy Clause immunity does not require express statutory authorization for a federal officer's specific act; instead the necessary authority may be derived from "the general scope of the officer's duties." *Baucom v. Martin*, 677 F.2d 1346, 1350 (11th Cir. 1982).

From the time Kleinert arrived at the bank on duty as a participant in the task force's ongoing investigation of the morning robbery, through Kleinert's discussion with Jackson after Jackson falsely identified himself to Bostick in an attempt to enter the bank and obtain funds–which actions could come within the federal crimes of bank robbery or bank fraud–through Jackson running away during Jackson's discussion with Kleinert, through Kleinert's pursuit of Jackson, and through Kleinert's phone call that he had shot Jackson, Kleinert was acting in his capacity as a federal-task-force member and was a federal officer. Nothing before the court reflects that Kleinert was acting in any other capacity through this sequence of events.

---

[8] There are no comparable offenses under Texas law.

16

As the task force, and Kleinert as an FBI specially deputized member of the task force, were authorized to investigate federal-bank-robbery offenses, the court concludes that Kleinert was a federal officer at all times relevant to this action on July 26, 2013.

Kleinert did not simply stumble upon Jackson. Kleinert, while at the bank performing his duties as a member of the federal task force, was asked by bank employees to investigate another possible federal offense; Jackson's misrepresentations to a bank employee that occurred in Kleinert's presence could constitute federal bank robbery or bank fraud.

The court concludes that Kleinert's status as a task-force member did not change or dissipate when Kleinert walked out the bank's front door to speak with Jackson about Jackson's misrepresentations to Bostick. Additionally, the court concludes that Kleinert's status as a task-force member did not change or dissipate when Jackson escalated events by running away from Kleinert during their discussion just outside the bank. Indeed, because Jackson fled, Kleinert became more suspicious about Jackson's activities at the bank. *See United States v. Navedo*, 694 F.3d 463, 474 (3d Cir. 2012) ("Unprovoked flight can only elevate reasonable suspicion to probable cause if police have 'reasonably trustworthy information or circumstances' to believe that an individual is engaged in criminal activity."); *see also Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Headlong flight–whenever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). Kleinert explained that he pursued Jackson because: (1) he was concerned about the status of Majors; (2) Kleinert believed Jackson had committed federal offenses in Kleinert's presence; and (3) Kleinert believed that Jackson fled to avoid being further detained or arrested for those offenses.

The court concludes that from the time Kleinert entered the bank until he called to report the shooting, Kleinert was a federal-task-force member authorized by deputation to investigate bank robberies and make arrests without warrant for any offense against the United States committed in his presence.

### Necessary and proper

Having determined that Kleinert is a federal officer, the court proceeds to evaluate whether Kleinert's conduct was no more than was necessary and proper for him to do. *Neagle*, 135 U.S. at 75; *Tanella*, 374 F.3d at 147.

### *Subjective belief of Kleinert*

For the subjective prong of the Supremacy Clause immunity analysis, the court's focus is on the intent of the federal officer and not the legality of his action. *Tanella*, 374 F.2d at 152 ("[w]e need not and do not decide that [the defendant officer] correctly evaluated the circumstances, but only that he honestly and reasonably perceived" his conduct as justified). An officer who reasonably believes his actions were necessary in the performance of his duties is immune from criminal liability. *Id.* at 141. "[I]f the federal officer makes an error in judgment in what the officer conceives to be his legal duty, that alone will not serve to create criminal responsibility in a federal officer." *Baucom*, 677 F.2d at 1350.

To be entitled to Supremacy Clause immunity, Kleinert must therefore have had an honest belief that his actions were justified. *Long*, 837 F.2d at 745. The court assesses Kleinert's actions under the circumstances as they existed at the time. *See Clifton*, 549 F.2d at 728.

Kleinert testified that he believed his actions and specifically the tactics he used were within the scope of his federal power, training, and duties as a federal-task-force member, and that his

actions were necessary and proper for him to carry out Jackson's detention and arrest. Kleinert believed that he was lawfully attempting to detain and arrest Jackson. Kleinert testified that he had no intention to kill Jackson or for his firearm to discharge.

The court carefully observed Kleinert's demeanor when testifying and has equally carefully considered his testimony and finds his testimony credible. Any variations between his in-court testimony, his affidavit, and his grand-jury testimony are insignificant. To the extent variations exist, they are what the court would expect when a person is called to testify several times under different circumstances and questioned in different contexts. The court finds no attempt by Kleinert to materially alter earlier testimony or to mislead the court. The court finds no guile in his testimony. Kleinert's testimony was straightforward, direct, consistent, and without evasion. The court finds no contradictions in Kleinert's testimony about what occurred from the time Kleinert arrived at the bank until he phoned police dispatch to report that he had shot Jackson. Further, the court finds no evidence nor any suggestion that Kleinert "acted because of any personal interest, malice, actual criminal intent, or for any other reason than to do his duty as he saw it." *Baucom*, 677 F.2d at 1350. Indeed there is no evidence that Kleinert acted with any other motive than doing his duty as he perceived it. *See Tanella*, 374 F.2d at 149; *Baucom*, 677 F.2d at 1350; *see also In re McShane*, 235 F.Supp. 262, 274 (N.D. Miss. 1964). All of the evidence indicates that Kleinert honestly believed that his actions were justified.

The State has not come forward with an evidentiary showing sufficient to raise a factual issue about whether Kleinert subjectively believed his actions were necessary and proper. The court concludes that Kleinert subjectively believed that his actions were necessary and proper.

### *Objective reasonableness of Kleinert's belief*

For the objective prong of the Supremacy Clause immunity analysis, the court's focus is on the reasonableness of Kleinert's belief that his actions were necessary and proper. *See Tanella*, 374 F.3d at 150.

Kleinert testified that he drew his firearm and pointed it at Jackson when he was about 50 feet away from Jackson. Kleinert ordered Jackson to stop and to get down on the ground. Jackson did not fully comply; although Jackson stopped, he did not get down on the ground. Kleinert then moved forward toward Jackson, continuing to point his firearm at Jackson, and yelled at Jackson to get down on the ground. Jackson did not comply.

At that split second, Kleinert faced a choice, either: (1) attempt to apprehend Jackson while continuing to hold his firearm; or (2) stop, take his eyes off Jackson, and holster his weapon before continuing his pursuit of Jackson. At that instant, Kleinert believed that he could not do both. Kleinert testified, if he took his eyes off Jackson to reholster his firearm, Kleinert believed Jackson would run again. If Jackson ran away again, Kleinert believed that he would loose sight of Jackson and would be unable to continue his pursuit of Jackson. Also, Kleinert did not want to abandon his pursuit because he did not have a good description of Jackson to pass along to police. Further, Kleinert believed he should continue to pursue Jackson with his firearm drawn because Kleinert did not know if Jackson had a weapon on him.

When Kleinert proceeded ahead and approached Jackson, again, Jackson ran, but this time, Kleinert caught Jackson by the t-shirt, near Jackson's shoulders. Jackson continued to run under the bridge with Kleinert holding on to his t-shirt. Immediately past the bridge, Jackson turned left to run up the embankment. Kleinert continued to hold on to Jackson's t-shirt with his left hand, and, in an

attempt to get Jackson to the ground, Kleinert hit Jackson two times in the lower back with his right hand. Kleinert hit Jackson using a "hammer-fist strike" while holding his firearm in the same hand, and placing his right index finger along the slide of the firearm.[9] Rather than going to the ground, Jackson stood up, turned around, and ran directly into Kleinert, knocking Kleinert to the ground. During Kleinert's fall, he heard the gunshot, and knew that his firearm had somehow fired and shot Jackson. Kleinert testified that he believes all of his actions were within the scope of his duties and training as a federal-task-force member, and that all of his actions were no more than what was necessary and proper to detain and arrest Jackson.

The State raises two arguments. First, the State argues that because Jackson was unarmed, fleeing, and posed no threat of serious physical harm to anyone, Kleinert's actions were neither necessary nor proper in the performance of his duties. Second, the State argues that Kleinert's belief that his actions were no more than what was necessary and proper to fulfill his duties was not objectively reasonable.

Specifically, the State argues that Kleinert's belief is not objectively reasonable because Kleinert's actions violated Austin Police Policies, which the State contends governed Kleinert's conduct. Specifically, the State argues that Kleinert's failure to abandon his pursuit of Jackson and call for backup at several points during the pursuit, Kleinert's approaching a civilian vehicle for assistance with his pursuit of Jackson, Kleinert's failure to holster his firearm before going "hands on" with Jackson, and Kleinert's use of his fist while holding his firearm to hit Jackson with hammer-fist

---

[9] A hammer-fist strike was described as a hit with a fist. Rather than a horizontal punch, a hammer-fist strike is administered by holding the fist as one would a hammer, and hitting up and down in a vertical manner, using the bottom portion of the fist near the heel of the hand.

strikes, were all acts in violation of police policies. Given all of these violations, the State argues that Kleinert's beliefs were not objectively reasonable.

At the motion to dismiss hearing, Jonathyn Priest, a forensic analyst and crime scene reconstructionist, testified as an expert for the State. Priest opined that Kleinert's actions were not consistent with the Austin Police Policy on foot pursuits because Kleinert was alone, he was in an unfamiliar area, and Kleinert should have holstered his firearm, even if it meant the end of his pursuit of Jackson. Also, at the hearing, Dan Montgomery, a police-practices expert, also testified for the State, essentially to the same extent as Priest–that Kleinert's actions were not consistent with the Austin Police Policy on foot pursuits. Both experts recognized however, that the police policies are only guidelines, and neither of them were aware of any requirements, rules, or prohibitions regarding foot pursuits.

Dennis May, a special agent and a tactical training officer with the FBI, testified at the hearing on the motion to dismiss and established that Kleinert was on duty as a member of the task force at the Benchmark Bank on July 26, 2013. May testified that although he had received a copy of Kleinert's statement of what had occurred on July 26, May had not read it nor had he spoken with Kleinert about the shooting.

May, who instructs on the mechanics of making arrests, testified about the training that special agents and task-force members receive from the FBI. May confirmed that deputized task-force members may make arrests for federal crimes committed in their presence. May also testified that there are no policies, practices, or training materials of the FBI or the task force that prohibit a task-force member from conducting a foot pursuit while a task-force member is alone, physically tired or winded, or is in an unfamiliar or secluded area. Further, there are no policies or procedures of the

22

FBI or the task force that prohibit a task-force member from initiating or continuing a foot pursuit alone and without a radio, or that prohibit a task-force member from continuing a foot pursuit without communicating with dispatch or any other task-force members, or without calling for backup assistance. Rather, the manner and mode a task-force member uses to detain or arrest an individual is left to the member's discretion.

In a situation where a task-force member is on duty for task-force business and the member witnesses an offense against the United States being committed in his presence, May testified that the task-force member should try to effect an arrest of the suspect. When effecting an arrest, task-force members are instructed to draw their firearm, point it at the suspect, and give verbal commands for the suspect to comply. If the task-force member has his firearm out and the suspect is not compliant or is fleeing, that presents one set of issues, just as likewise if the task-force member's weapon is holstered and he does not have his firearm out, and the suspect is not compliant, that presents another set of issues. While agreeing that it is not optimal for a task-force member to go "hands on" with a suspect while holding a firearm, May explained that sometimes it happens and is necessary. Additionally, there are no FBI policies or training materials that prevent or prohibit a task-force member from delivering a hammer-fist strike while holding a firearm in the same hand. May explained that what would cause a task-force member to take such action, would be the suspect's noncompliance. Further, May knew of no changes to any policies or training procedures since July 26, 2013.

David New, a Lieutenant with the Austin Police Department, who oversees and directs the training unit at the police academy, testified that officers are taught to respond to a suspect's resistance. The force level an officer uses is determined by the suspect's resistance. New also

testified that there are no prohibitions regarding foot pursuits and officers are trained in how to administer hammer-fist strikes. New also testified that absolute restrictions cannot be placed on officers, as situations are often fluid, particularly confrontational ones, and officers must use their own judgment.

Enrique Flores, an Austin Police Department Officer and firearms instructor at the police academy, testified that officers are instructed to use hammer-fist strikes and that a suspect's running away from an officer is considered defensive resistance. Flores explained that officers are not trained explicitly to perform a hammer-fist strike while holding a firearm, but officers are never told not to do so. Officers are instructed to react to the circumstances presented.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than the 20/20 vision of hindsight." *Graham v. Conner*, 490 U.S. 386, 396 (1989). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97. Factors relevant to the reasonableness of the use of force include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.

Federal courts have held that a police officer going "hands on" with a fleeing suspect while holding a firearm constitutes an objectively reasonable use of force. *See e.g., Pleasant v. Zamieski*, 895 F.2d 272, 273 (6th Cir. 1990) (fleeing suspect and struggle with officer who was "hands on" with firearm in hand trying to prevent suspect from getting away and accidental discharge killing suspect; not objectively unreasonable). The *Pleasant* court found that officer Zamieski had "little time to

react" and had he "taken time to put his gun away, Pleasant would have escaped." *Id.* at 276-77; *see also, Watson v. Bryant*, 532 F.App'x 453, 455 (5th Cir. 2013) (unpublished opinion).

In *Tanella*, the court held that the federal officer was entitled to Supremacy Clause immunity from state prosecution when the officer went "hands on" with a fleeing suspect while holding a firearm. 374 F.3d at 143. Like Kleinert, Tanella, a task-force member, pursued a suspect on foot, shouted at the suspect to stop, and drew his firearm. *Id.* Also, similarly, the suspect continued to run from Tanella. Tanella, with firearm in his hand, caught up to the suspect, and the two began to struggle hand-to-hand. During the struggle, the suspect was shot and killed. *Id.* The difference between *Tanella* and the facts before this court is that Tanella intentionally shot the suspect because Tanella thought the suspect was reaching for a weapon. The *Tanella* court, despite the intentional shooting, determined that Tanella was nonetheless entitled to Supremacy Clause immunity. *Id.* at 152 ("We need not and do not decide that Tanella correctly evaluated the circumstances, but only that he honestly perceived [the suspect] as a threat to his life.")

Here, there is no evidence that Kleinert intentionally shot Jackson, nor is Kleinert charged with intentionally shooting Jackson. Based on Kleinert's testimony, before going "hands on" with Jackson, Jackson had been noncompliant, was resistant, and had run away from Kleinert twice. Kleinert believed he needed to go "hands on" with Jackson with his firearm in his hand to detain and arrest Jackson.

Once Kleinert was within the 50 feet of Jackson, he had drawn and pointed his firearm at Jackson, and told Jackson to stop and get down on the ground, but Jackson did not get down on the ground. Kleinert at that instance had to make several split-second decisions. When Jackson failed

to comply with Kleinert's orders, Jackson started running, Kleinert caught up to him, and the two engaged in a struggle.

For Supremacy Clause immunity purposes, the court does not decide that Kleinert correctly evaluated the situation, but only that he honestly and reasonably perceived the situation. *See Clifton*, 549 F.2d at 728 (immunity "does not require [an officer] to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be") *see also*, *United States v. Lipsett*, 156 F. 65, 71 (W.D. Mich. 1907) (federal officer is "not liable to prosecution in the state court from the fact that from misinformation or lack of good judgment he transcended his authority").

Although it is Montgomery's and Priest's opinions that Kleinert violated Austin Police policies, it was also their opinions that those polices are guidelines only and that there are no prohibitions or rules against officers engaging in foot pursuits or using hammer-fist strikes. Further, New and Flores testified that there are instances where actions such as those taken by Kleinert are appropriate.

Given that Kleinert's deputations authorized him to make warrantless arrests for federal offenses committed in his presence, the court finds that after Jackson fled the discussion with Kleinert at the bank, Kleinert's pursuit and attempt to detain and arrest Jackson was objectively connected to his federal duties. Further, as the court has determined that Kleinert was a federal officer during all of the relevant events, the court finds May's testimony about the training and duties of a federal-task-force member compelling and dispositive with regard to the reasonableness of Kleinert's belief that his actions were necessary and proper. In summary, May testified that the manner and mode a federal officer determines to use in detaining or arresting a suspect are left to the discretion of the federal officer; and there are no particular rules or prohibitions.

Given the circumstances as they appeared to Kleinert, the court concludes that Kleinert's belief that he did no more than what was necessary and proper to effect an arrest of Jackson was reasonable. Additionally, evaluating Kleinert's actions based on the Austin Police policies, the court finds it compelling that it is uncontroverted that the policies are not prohibitions, restrictions, or limitations on officers. As explained by New and Flores, there may be occasions when an officer would believe he needed to use hammer-fist strikes with a firearm in the same hand to deal with a noncompliant suspect.

The court concludes that given all of the circumstances surrounding his attempt to detain and arrest Jackson for the federal offenses committed in Kleinert's presence at the bank, the State has not brought forward evidence to raise a genuine issue of fact that Kleinert's belief was unreasonable. In reviewing the evidence in conjunction with the undisputed surrounding circumstances, the court finds and concludes that Kleinert's belief was objectively reasonable.

**Conclusion**

There can be no doubt that a tension exists between state and federal law, but it is a tension begat by the very nature of federalism. The constitution is the supreme law of the land, transcends state law, and does not recognize obstruction. The several states have legitimate interests in enforcing their own laws. A federal court should not interfere with state laws and procedures absent exceptional circumstances. The court concludes that this case presents exceptional circumstances that compel the court to intervene in the state prosecution of Kleinert.

The court concludes that, at all times relevant to this case, Kleinert acted as a federal officer. The material facts of the case do not differ significantly from those in *Neagle* and *Tanella*. In each case, the officer was performing a federal function when the factual chain of events began. Once

those events began, regardless of the outcome, a court may not begin to second guess the actions of the officer as the events unfold. This court will not slice the four-minute sequence of events on July 26, 2013, into discrete segments, requiring Kleinert to stop and reevaluate his position while in pursuant of Jackson. To do so would render meaningless the constitution's position as supreme, and open each instance of federal-officer action to second guessing under state law. Immunity exists to avoid such result. Kleinert was acting as a federal officer from his first to last encounter with Jackson. At all times, Kleinert was attempting to detain and arrest Jackson for committing federal offenses in Kleinert's presence–actions that Kleinert was authorized by federal law to perform.

The court finds and concludes that the State has presented no evidence that Kleinert acted with any motive other than doing his federal duty to arrest and detain Jackson for offenses committed in his presence and that Kleinert subjectively believed that his actions were necessary and proper.

The court finds and concludes that the State has failed to provide any evidence that raises a genuine issue of fact that Kleinert's belief in the propriety of his conduct was objectively unreasonable. Jackson fled from Kleinert at the bank. After Kleinert caught up to Jackson, Jackson failed to comply with Kleinert's oral commands, despite the fact that Kleinert had his firearm drawn and pointed at Jackson. Kleinert, in a split-second decision, chased Jackson, caught up to Jackson, and the two engaged in a struggle. Despite Kleinert holding Jackson by the t-shirt, Jackson continued to resist. As Kleinert had his weapon drawn, he could not holster his firearm without letting go of Jackson. Kleinert hit Jackson twice with two hammer-fist strikes while holding his firearm in the striking hand with his index finger on the slide of the handgun. Jackson still did not submit. In a third attempt to run away, as Kleinert was about to hit Jackson a third time, Jackson, spun around and

turned into Kleinert.  At that moment Kleinert's firearm discharged.  It is uncontroverted that the gunshot was a "sympathetic discharge," meaning that the gunshot was not an intentional discharge.

Kleinert's decision to go "hands on" with Jackson, rather than letting Jackson flee, may in the minds of some make Kleinert's conduct questionable.  However, questionable conduct or decision making is not before the court; before the court is whether the State has raised an issue of material fact about the objective reasonableness of Kleinert's belief that he was justified in pursuing and going "hands on" with Jackson in an attempt to detain and arrest Jackson for federal offenses that had been committed in Kleinert's presence.  Certainly Kleinert's plan to detain and arrest Jackson went awry, when Jackson failed to comply with Kleinert's orders after Kleinert had drawn his firearm.  Kleinert and Jackson ended up in a hand-to-hand struggle, because Jackson was actively resisting Kleinert's attempts to detain and arrest Jackson.  The court finds and concludes that the State has failed to raise a material issue of fact that Kleinert's belief that his actions were no more than was necessary and proper was objectively unreasonable.

As both elements of Supremacy Clause immunity are met, Kleinert is entitled to its protection and the State's prosecution of Kleinert is barred.  Kleinert's motion will be granted and the indictment dismissed with prejudice.

**IT IS ORDERED** that Kleinert's Motion to Dismiss Indictment filed June 26, 2015 (Clerk's Document No. 49) is **GRANTED**.

**IT IS FURTHER ORDERED** that the State of Texas's indictment charging Kleinert with manslaughter is **DISMISSED WITH PREJUDICE**.

SIGNED this _29th_ day of October, 2015.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE